DYSON *v.* STATE

[No. 238, September Term, 1964.]

*Decided April 27, 1965.*
*Motion for rehearing filed May 22, 1965, denied June 2,*

*1965; motion to correct record filed May 22, 1965, granted June 2, 1965, and per curiam opinion filed, reported at 238 Md. 546, infra.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Joseph G. Koutz* for the appellant.

*John W. Sause, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Charles E. Moylan, Jr., State's Attorney for Baltimore City,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant Dyson was charged with rape in two cases and, in each case, the jury found him guilty. In one case, not now before us, the jury added to their verdict the words "without capital punishment" and the sentence was imprisonment for twenty years; in the other, the case before us, the jury did not qualify their verdict of guilty of raping Mrs. Helen Kelly and the court imposed the death penalty. The appeal is from the latter judgment and sentence.

At the trial below in the Kelly case, the strategy of the defense was to attempt to persuade the jury that the rape had been committed by one James Melvin. The trial tactics which it was hoped would make the strategy successful were to prevent the victim from identifying Dyson as her assailant, to keep out of evidence damaging admissions made by Dyson to the police, and to present to the jury the fact that Melvin had confessed to the Kelly rape and keep from the jury any explanation of why the police and the States' Attorney did not believe Melvin committed that crime and, therefore, why they did not prosecute him for it. In this appeal, Dyson continues his strategy by claiming reversible errors in the actions of Judge Harris in (a) permitting the court room identification to be made, (b)

admitting the statements, and (c) permitting explanation of the reasons why Melvin was not prosecuted, and claims further such errors in (d) the admission of a photograph of the victim taken after the assault, (e) the court's instructions, (f) the insufficiency of the evidence, and (g) the imposition of the death sentence.

In late 1962 and early 1963 there had occurred a series of sexual assaults on women in the Bolton Hill area of Baltimore. Mrs. Helen Kelly was brutally assaulted and raped about 1 :00 a.m. on January 31, 1963 (as she was returning home from work) in the eighteen hundred block of Morris Alley, which runs between Eutaw Place and Madison Street, by a man who overtook her and seized her from behind. Early in the morning of February 14, 1963, one Delores Cannaday was choked at Druid Hill Avenue and Laurens Street. She promptly gave a description of her assailant to the police. About eight-thirty in the evening of the same day, Officer Stanley, who was cruising in a police car with another officer and a policewoman, saw Dyson walking in the sixteen hundred block of Pennsylvania Avenue and, believing that he fitted the description of the Cannaday assailant, took him into custody. Five minutes after the arrest, Sergeant Todd, who was in charge of the investigation of the Kelly rape and other similar crimes in the Bolton Hill neighborhood, arrived at the police car in which Officer Stanley had put Dyson, and witnessed a search of Dyson's person. Certain articles were taken from him but the record does not reveal what they were. Dyson was taken to police headquarters and questioned for some time about the Cannaday occurrence. He was then placed in a cell where he remained until February 15, at seven-thirty in the evening, when he was put in a line-up which was viewed by Mrs. Kelly. She was unable to identify Dyson. About two hours later he was taken to a hospital and placed in another line-up as part of the investigation of another case. At ten-thirty, interrogation as to the Kelly case began. At eleven-forty-five he began a trip about the City with the police, pointing out the locations at which various assaults had occurred. When he was returned to police headquarters at twelve-fifty-five, he was questioned further. He began giving the statement used against him in the Kelly case

at one-fifteen on the morning of February 16 and finished at two-ten. In this statement he said:

"When I turned the corner on Laurens Street from Eutaw Place I saw this lady [Mrs. Kelly] walking toward me in the 300 Block of Laurens Street. We were both crossing Morris Alley, she was walking and I was running and I ran into her. When I ran into her she began to struggle with me and because I was mad about the fight [which had broken out in a group of friends which Dyson had just left] I hit her with my fist that was partially closed. I don't know where I hit her but I hit her solid because my hand swoll up and it was sore for a day or two."

After Dyson gave the statement he was taken to the office of police captain Deuchler, and Mrs. Kelly, who was there, again could not identify him until, the record indicates, she recognized his voice when he spoke, saying he did not know her (on cross-examination, when the validity of her court room identification was vigorously attacked, she insisted several times that, "I did not forget his voice").

We find no error in the admission into evidence of Mrs. Kelly's identification of Dyson as the man who attacked her. The fact that she had failed to recognize him in a line-up and in the captain's office until he spoke, all of which was before the jury, went to the weight of her testimony but did not make it inadmissible. *Hursey, Jr. v. State,* 233 Md. 243; *Booth v. State,* 225 Md. 71; *Lenoir v. State,* 197 Md. 495, 504 ("Both Miss Nelson and Mr. Cann testified that they identified his voice when they saw and heard him talking to Captain Kriss. The testimony was clearly admissible, its weight and the credibility of the witnesses being for the jury. *Rowan v. State,* 175 Md. 547, 557, 3 A. 2d 753"). See also *Lubinski v. State,* 180 Md. 1, 8-9. The court's instructions on the point to the jury suggested full consideration of the weakness of the failure of the extrajudicial identification. Judge Harris said, in part, of Mrs. Kelly's identification of Dyson:

"The weight and value to be given to this testimony, her inability to pick him out of a line-up, her ability

to pick him out at the trial table, merely means that the issue is sufficient to be submitted to you for your determination, and not that of the court. It can or cannot, in you own sound judgment, amount to a sufficient identification of the defendant by Mrs. Kelly. You must weigh the testimony, not on the number of witnesses who testify to either version, or either side, but on what you believe to be the most credible and reliable testimony under all the evidence."

The record offers no support for appellant's claim that he was unconstitutionally required to incriminate himself when he was taken to the captain's office to meet Mrs. Kelly. All that appears is that Mrs. Kelly did not recognize Dyson until he said he did not know her and then, apparently, she remembered his voice. This Court, as have many others, consistently has held that requiring a suspect before trial to assume a posture or give his fingerprints or put on clothing similar to that worn by the criminal at the time of the commission of the crime, or otherwise reasonably to present his physical attributes as an aid or guide to identification, does not amount to requiring the suspect to incriminate himself or affront any other of his constitutional rights. *Williams v. State,* 231 Md. 83, 86-87; *Davis v. State,* 189 Md. 640, 644; *Shanks v. State,* 185 Md. 437, 444; *cf. Lenoir v. State, supra;* 13 Md. L. Rev. 31, 33; 17 Md. L. Rev. 193, 208-211.

The appellant offered no evidence that the admissions he made to the police were in fact involuntary, and, all things considered, including the length of the detention and interrogation and the manner and intensity of the questioning, there is nothing before us to require a finding that they were. He argues first that the State did not offer as witnesses to voluntariness every policeman who was present when the statement was given; second that the statement was inadmissible because it was made while he was in custody after an illegal arrest and was without counsel and without advice as to his constitutional right to remain silent; and third that the statement was not complete.

Officer Stanley, one of the arresting officers, testified that no threats or promises were made and no inducements offered to

Dyson while he was in their custody prior to being turned over to the custody of Sergeant Todd. Sergeant Todd testified that he was present during all of the periods of interrogation of Dyson and that neither he nor anyone else made threats or promises to Dyson or offered him any inducements to confess. This testimony, undenied by the appellant at the trial, persuaded Judge Harris that the statement had been made voluntarily and he admitted it into evidence and submitted the question of its voluntariness to the jury under proper and appropriate instructions. He was justified in so doing. The State was not required to offer the testimony of all the policemen who were present when the statement was made. The testimony of Officers Stanley and Todd was the product of personal observation and knowledge, covered all critical periods from arrest to the making of the statement, was not controverted by the accused and, if believed, was proof that the statement was in fact voluntary. *Streams v. State,* 238 Md. 278, and cases cited.

The arrest of Dyson would clearly seem to have been on suspicion that he had committed a misdemeanor, simple assault, on Delores Cannaday, and was therefore illegal. In Maryland a statement voluntary in fact is not made inadmissible merely because it was given after an illegal arrest, without the advice of counsel and without the advice of the interrogator of the right to remain silent. *Hadder v. State,* 238 Md. 341; *McChan v. State,* 238 Md. 149; *Johnson v. State,* 238 Md. 140; *Davis v. State,* 236 Md. 389, 398; *Anderson v. State,* 237 Md. 45; *Swartz v. State,* 237 Md. 263; *Green v. State,* 236 Md. 334; *Mefford and Blackburn v. State,* 235 Md. 497; *Bean v. State,* 234 Md. 432; *Prescoe v. State,* 231 Md. 486; and *Hyde v. State,* 228 Md. 209.

There is no substance to the claim that the statement made by Dyson was incomplete. The appellant's theory is that not everything Dyson said while in custody was spelled out. Sergeant Todd's testimony was that every word said by him or Dyson from the time the statement began until it ended was included in the writing. Appellant makes no showing that the statement was not a complete account of the period and events it purported to cover.

In support of his defense that Mrs. Kelly had been raped by

James Melvin, the appellant offered the only witnesses he presented, putting on the stand some of the policemen who had arrested and questioned Melvin, his parole officer and a doctor who testified as to his psychiatric history. In his examination of the ranking officer who had interrogated Melvin, counsel for the appellant elicited the fact that in a written statement Melvin had confessed to raping both Mrs. Kelly and one Icodean Zeikiel. He offered the statement in evidence and it was admitted. He then proposed to read only that part of the statement which referred to the Kelly case and the court ruled that the entire contents were in evidence and could be read to the jury by either the State or the defense. Counsel for appellant then elected to read to the jury only Melvin's confession to the rape of Mrs. Kelly. When he had finished this reading, he examined the police officer who had taken the statement as to details mentioned in the confession and as to admissions by Melvin that he had previously been accused of (and sometimes convicted for) sexual crimes, including an accusation of rape. He concluded his examination with the question: "Sergeant, did you charge the defendant [Melvin] with this crime?", referring to Mrs. Kelly's rape, to which the answer was: "I did not."

On cross-examination the State's Attorney was permitted to read to the jury that part of Melvin's confession which the defense had not read and to show by the police officer's testimony that there were a number of demonstrable errors, inconsistencies and improbabilities in Melvin's confession. For example, Miss Ziekiel had not been raped and Melvin said he had raped her; the clothing worn by the victims was misdescribed and the actual clothing he could not identify; Melvin took the police to an alley a block north of and a block east of the locale of the Kelly rape and said the crime occurred at this wrong spot. It was also brought out that Melvin had been at Crownsville Hospital for mental patients and was an avid reader of newspaper accounts of crime. The discrepancies in Melvin's statements led the police to confer with the State's Attorney and, as a result of the conference, it was decided not to charge Melvin, but to arrange for his recommitment to Crownsville.

We think there was no error in permitting the reading of the whole of Melvin's confession and the presentation of the reasons why the State had not prosecuted him.

Although Maryland formerly followed the general rule that a penal declaration against interest of a third party was not admissible evidence, the later cases have established that a confession by one other than the defendant, that he committed the crime in question, should be received and considered by the trier of the guilt of the accused, unless it is clearly collusive, frivolous or otherwise obviously untrustworthy. *Brady v. State,* 226 Md. 422; *Thomas v. State,* 186 Md. 446; *Wiggins v. State,* 235 Md. 97, 103; *Brennan v. State,* 151 Md. 265; 23 Md. L. Rev. 178.

In *Brady,* Chief Judge Brune, speaking for the Court in considering two fairly common applications of the modern rule (or exceptions to the former rule), quoted with approval these statements led the police to confer with the State's Attorney and, third rules of that case) (p. 428 of 226 Md.) :

> "In *Thomas v. State, supra,* 186 Md. at 452, Judge Delaplaine, speaking for the Court said: '[W]e hold that where a witness has made a written confession that he committed the crime with which the defendant is charged, the defendant should be allowed to introduce the confession in evidence and question him in regard to the confession and the circumstances under which he made it. We further hold that where in a criminal case an officer has secured contradictory confessions from two different persons, the defense should be permitted to question him about both confessions and we further hold that such a confession by a third party is admissible unless it appears that there was some collusion in obtaining it.' "

Judge Brune later said (p. 429) :

> "To what extent a confession or admission of a third party is free of collusion and bears the indicia of trustworthiness is a question which we think should be entrusted in the first instance to the sound discretion of the trial judge. Certainly, the 'confession' of a crackpot, anonymous or otherwise (and such 'confessions' are not uncommon in cases of wide notoriety), would not bear any hallmark of trustworthiness, and would

not call for the application of the second or third rules of the *Thomas* case."

Since there was no evidence of collusion as to the Melvin confession and it was not on its face obviously untrustworthy, it properly went before the jury for its consideration in determining the validity of Dyson's admission and whether under all the evidence his guilt had been proven.

The jury would not have had before it enough evidence properly to perform its duty to judge the worth of the Melvin confession and, overall, the guilt of the appellant, if the testimony on the point had ended when the defense rested. The State was entitled to read into evidence the whole of the Melvin confession and to explain the discrepancies in it to provide the background to rebut the inference the defense sought to create and leave with the jury, that, for some unexplained reason, the police and prosecutor had chosen to exonerate one man, Melvin, who had made a full confession of rape of Mrs. Kelly and to prosecute another man, Dyson, who had made no more than a damaging admission. *Wiggins v. State, Brady v. State, Thomas v. State,* all *supra.*

The photograph of Mrs. Kelly's face, which the appellant complains the jury should not have seen, shows the severity of the beating to which she was subjected. The picture was admissible as relevant to several pertinent facets of the case. *Sisk v. State,* 232 Md. 155, 158. It corroborated Dyson's admission that he struck the victim so "solid" that his hand "swoll up" and was sore for several days. It corroborated Mrs. Kelly's testimony as to the attack on her and it was relevant for the jury to consider on the determination it would make of whether or not to qualify its verdict. At the time of the admission of the photograph, the court cautioned the jury that it was before them only to show "the physical condition of this witness [Mrs. Kelly] on the date and time specified." There was no abuse of discretion in the admission of the picture.

Dyson's trial counsel did not state "the portion, or omission or failure to instruct" to which he objected in the court's advisory instructions as he is required to do if the errors claimed to have been committed are to be considered on appeal under

Md. Rules 756 f and g, but he has asked us to act under the provision of the latter rule that:

"* * * the Court of Appeals either of its own motion or upon the suggestion of a party may take cognizance of and correct any plain error in the instructions, material to the rights of the accused even though such error was not objected to as provided by section f of this Rule."

Because the death sentence was imposed, we have carefully reviewed the instructions given by Judge Harris and have found no prejudicial error.

The appellant argues that the charge was misleading and contradictory, and ignored theories of the defense which were supported by the evidence—that is, that admittedly only one man perpetrated the Kelly rape and that man was Melvin. The supposed error is found in the instructions that the Melvin confession "* * * in and of itself has nothing whatsoever to do with guilt or innocence of the defendant in this case * * *." The court followed this by saying next:

"* * * although you may consider the effect of Melvin's statement as well as the defendant's statement in arriving at your verdict. My purpose in making this statement to you is to emphasize that any testimony in the nature of hearsay, told by Melvin to the lieutenant, bears upon only the issue of arrest [the arrest and detention of Dyson previously referred to in this connection in the charge] and upon the issue of the guilt or innocence of the defendant in this case."

We think it clear that Judge Harris meant—and that the jury would have known that he so meant—that Melvin's confession alone could not incriminate Dyson and that what Melvin had told the police was not "in and of itself" evidence against Dyson, but that the Melvin confession bore upon whether the police and the prosecutor rightly and accurately had chosen between two suspects, and, therefore, bore upon Dyson's guilt or innocence. These instructions did give recognition to the ap-

pellant's theory that Melvin was the only guilty man and aided the jury in accepting, or rejecting as they did, that theory.

Appellant's other quarrel with the instructions is that the court, after instructing on the general distinction between a confession and an admission, erred by saying:

"The admission given by the defendant in this case, which has been admitted into evidence, shows obviously that he did not confess to rape or to an intention to rape. It does amount, in my advisory opinion, to a confession of assault upon Mrs. Kelly; but the decision is up to you on all these matters.

"You are not to be influenced by any remarks that I may make, or as to what I believe the admission means."

Judge Harris had previously told the jury what simple assault was in distinction to assault with intent to commit various crimes. In context the judge was illustrating concretely the differences between confessions and admissions he had previously explained abstractly, and his expressed view that Dyson had not admitted rape or intent to rape could only have been helpful to Dyson since it emphasized to the jury that he had not confessed to the serious crimes charged. There can be no doubt that the court was right in saying that Dyson had confessed to simple assault and he told the jury they were not to be influenced by his remarks "or as to what I believe the admission means." We find no error under the circumstances. *Wiley v. State,* 237 Md. 560.

There is no merit to appellant's argument that the evidence was insufficient to permit the jury to have convicted him. He seeks on this aspect of the appeal to throw out the identification by Mrs. Kelly—and indeed all she said from the stand—because of inconsistencies in her testimony which are claimed to be so great and so material as to destroy the credibility of everything she said. The inconsistencies were often more apparent than real and, in any event, were relatively minor and not as to vital points.

The final claim of appellant is that the sentence was cruel and unusual punishment. The Legislature in Code (1957), Art. 27, Secs. 461 and 463, has authorized the death penalty in rape

cases if the jury does not add to their verdict the words "without capital punishment." The jury did not add those words to their verdict in this case. The sentence was not, therefore, cruel and unusual. *Giles v. State,* 229 Md. 370, 388, *app. dis.* 372 U. S. 767; *Merchant v. State,* 217 Md. 61, 70; *Lowery v. State,* 202 Md. 314, 321; *Reid v. State,* 200 Md. 89, 92-95, *cert. den.* 344 U. S. 848.

*Judgment affirmed.*

*Per curiam* opinion on motions for rehearing and to correct record follows at page 546 of 238 Md., *infra.*