STATE of Missouri, Plaintiff–
Respondent

v.

Dennis R. BISHER, Defendant–
Appellant.

No. 28158.

Missouri Court of Appeals,
Southern District,
Division One.

May 28, 2008.

William J. Swift, Asst. Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JOHN E. PARRISH, Presiding Judge.

Dennis R. Bisher (defendant) was convicted, following a jury trial, of murder in the first degree, § 565.020, and armed criminal action, § 571.015.[1] He was charged, convicted, and sentenced as a prior offender. *See* § 558.016. This court affirms.

"For purposes of appellate review, evidence that supports the verdict is taken as true, together with all reasonable inferences favorable to the verdict. Evidence to the contrary is disregarded." *State v. Scott*, 78 S.W.3d 806, 808 (Mo.App.2002).

Defendant moved into the residence of William and Naomi Nance in Shell Knob, Missouri, in May 2005. Defendant's girlfriend, Etta Jane Harper, also lived there.

---

1. References to statutes are to RSMo 2000.

On July 3, 2005, defendant arrived at his aunt's house in Matthews, Missouri. He was driving a Ford Ranger truck owned by Etta Jane Harper. He told his aunt that he was en route to East Prairie, Missouri, to visit his mother. He had mud on his pants that he said had come from a dairy farm where he stopped before arriving at his aunt's house. He gave his aunt a blue tarp and asked her to throw it away.

Defendant called his aunt the day after his visit. He told her he was going to get rid of the truck he had been driving; that he was going to catch a bus and go to Mexico.

During the early morning hours of July 4, 2005, a 2000 Lincoln Town Car owned by Naomi Nance was found alongside Highway 39 in Barry County about 13 miles from the Nance residence. It appeared to have left the highway, struck some trees, and come to rest in a grassy area alongside the road. The vehicle had burned. A can of lighter fluid was found in the burn area near the vehicle. There was a hammer in the back seat. A Lorcin .380 semi-automatic pistol and holster were found near the car.

Naomi Nance and Etta Jane Harper went to the Barry County Sheriff's office the morning of July 5. After talking to the women, Sheriff Mick Epperly located the Lincoln automobile at a salvage yard. Later, Sheriff Epperly went to the area along Highway 39 where the car had been found, then to the Nance residence at Shell Knob. Naomi Nance had consented to a search of her car and residence.

When he arrived at the Nance residence, Sheriff Epperly opened a door and looked inside. He explained:

When I opened the door, I could tell the residence had been badly burnt. Tremendous amount of heat still coming from the inside of the house. The ceiling fan was on, so I knew the electricity was still on, and we backed out of the residence and shut the electricity off.

The sheriff was concerned that a victim or suspect might be in the house. After the electricity had been shut off, he entered the residence and walked through it. He noticed a lot of soot in walking through the house. He saw that the carpet had been burned "like someone had taken some accelerator and poured on the carpet to burn it."

Two pairs of pajamas were in a trash can inside the residence. One pair of pajamas was pink. The other consisted of a T-shirt that was described as "Café '55—like the car '55—Chevy '55 T-shirt" with blue bottoms. Both pajama shirts were blood-stained. Testing revealed that the blood on both pairs of pajamas indicated the presence of DNA consistent with that of William Nance.

A criminal investigator from the Missouri State Highway Patrol, Sgt. Roger Renken, testified about the blood-stained pajamas. His specialized training included crime scene investigation and blood stain pattern analysis. When he was initially contacted and asked to assist in the investigation, Sgt. Renken was told that two women had contacted the sheriff's office and reported that one of the women's husbands had been murdered. Sgt. Renken began his investigation July 5.

Sgt. Renken was asked the following questions and gave the following answers regarding the blood stains on the two pairs of pajamas.

Q. On [the Cafe '55 shirt], what kind of display was on that?

A. It was a—blood stains consistent with high velocity—an impact stain.

Q. And if it's consistent with high velocity, does that mean a wearer would be in close proximity of an

individual who has received a blood—a gunshot, generally speaking?

A. That would be accurate to say.

Q. As to the other one—I believe you said it was pink?

A. Pink, yes.

Q. As to the pink shirt, what kind of staining are you seeing there?

A. It looked more like transfer stains, and very little.

Sgt. Renken also told of finding ".380 auto ammunition, PMC brand" in a drawer in a piece of furniture in the dining room area of the house. He testified that it was the type of ammunition that could be used in the Lorcin .380 handgun. He also testified that blood droplets had been found on a front porch and a back deck at the residence; that large amounts of blood were in the bedroom. DNA testing revealed that blood at the residence and blood on the Lorcin .380 handgun that was recovered where the Lincoln automobile had burned were consistent with the DNA profile for William Nance.

Barry County Sheriff's personnel issued a notice that it was looking for defendant, Etta Jane Harper's pickup, and the body of William Nance. The sheriff's department received information the afternoon of July 5 that William Nance's body had been found by fishermen in a wooded area near the Mississippi River in Scott County, Missouri. Evidence near the location where the body was found indicated that a vehicle had driven through a tree line; that a body had been dragged from the vehicle. Tire impressions in the area were consistent with the tires on the Ford Ranger that defendant had been driving.

Defendant was arrested the night of July 5 in the Gray Line bus lot in Hollister, Missouri. He was alone inside the Ford Ranger on the driver's side. The truck was searched, looking for a weapon. No weapon was found. During the course of the search, the arresting officer learned that the truck might be a crime scene. He terminated the search, locked the truck, and called a tow truck. The truck was taken to the Hollister, Missouri, police station where it was secured.

An autopsy revealed that William Nance died as a result of a gunshot wound to the head. In addition to a bullet hole in the skull, the body had three lacerations on the right side of the head caused by a blunt instrument and injuries to the left hand and the right hand.

Defendant was interviewed by law enforcement officers on July 6 and 7, 2005. Missouri Highway Patrol Sgt. Larry Wolters testified about the July 6 interview. Chief Deputy David Bowman of the Barry County Sheriff's Department testified about the July 7 interview.

Defendant told conflicting stories about when he last saw William Nance. He initially said he last saw Nance the evening of July 3, 2005, at a lake where he claimed he had helped Nance put a boat in the water. Defendant said he left about 8:00 p.m. in Harper's (his girlfriend's) truck to visit relatives in East Prairie, Missouri. He later said the last time he saw Nance was at Nance's house; that Nance was on the front porch at the house.

Sgt. Wolters said defendant was asked if he killed Nance; that defendant answered, "I didn't think I did." However, at some point in the interview, defendant said he and Nance had fought over a gun; that in the course of the struggle, the gun discharged. Defendant demonstrated how the gun was pointed when it discharged. He lifted his hands toward his head in gesturing how the gun was pointed when it fired.

Sgt. Wolters was asked the following questions and gave the following answers about what happened after the gun fired.

"Q. .... What did [defendant] first describe as happening after the shooting?

A. He indicated to us that one of the first things he did after his [sic] had happened was try to cut the carpet and clean up the—the carpet.

Q. What about—what about Mr. Nance, did he say what he did with the body at that point?

A. He indicated that he had drug Mr. Nance's body across the carpet and taken him outside into the trunk of the vehicle.

Q. What kind of vehicle?

A. I believe it was described as a Lincoln. I know from the investigation as to what the car was, but I recall [sic] right now if he said exactly at that point in time. I think he did.

Q. All right. Did he make any comment as to his intentions as to the vehicle?

A. He did.

Q. What did he say?

A. His intention or his thought was to take the vehicle somewhere and tear it up; however, he indicated that for some reason he was unable to do that as it turned out.

Q. Was a crash mentioned at some point, ...."

A. Yes.

Defendant said he crashed the car in which he was transporting Nance's body. He got a ride back to the Nance residence and returned to the crash site in Harper's truck. He said he rolled the body from the trunk of the car into the bed of the truck. He covered it with a blue tarp and eventually transported the body to Southeast Missouri where it was dumped.

Defendant asserts two points on appeal. Both are directed to trial court rulings on evidentiary issues. This court's review of the admission or exclusion of evidence is undertaken on the basis that evidentiary rulings are matters in which the trial court has broad discretion; that those rulings will not be disturbed on appeal absent abuse of discretion. *State v. Robinson*, 90 S.W.3d 547, 550 (Mo.App. 2002). "Furthermore, in matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Harrison*, 24 S.W.3d 215, 218 (Mo. App.2000).

Point I contends the trial court erred in sustaining the state's objection to testimony of Missouri Highway Patrol Sgt. Miles Parks regarding statements made to him by Naomi Nance in which she stated she was wearing two-piece pink pajamas when William Nance was killed and statements made by Etta Jane Harper in which she stated she was wearing blue pajama bottoms and a white Cafe '55 Chevy T-shirt. Defendant argues that the statements of the women were admissible as declarations against penal interest that would have "established the two women were wearing these clothes when Mr. Nance was killed and that was why the clothes were bloodstained which was crucial to the defense theory that the two women, and not [defendant], killed Mr. Nance."

The state filed a motion in limine directed to a number of issues, one of which was directed to "[c]ertain witness statements [that] indicate what clothing Naomi Nance, Etta Jane Harper and the Defendant were wearing on the night of July 3–4, 2005." The motion stated that in the event the state did not call Naomi Nance or Etta Jane Harper as witnesses, attempts by

defendant to elicit information based on out-of-court statements about what clothing they had worn would be hearsay. The motion asserted that "[t]he State believe[d] that the Defense [might] attempt to elicit such information from law enforcement witnesses, however, even a timely objection would not keep the jury from drawing improper inferences from a question regarding inadmissible testimony."

The trial court heard the motion in limine prior to commencement of trial. The state explained that it did not intend to call either of the women. It argued that anything the women may have said in prior interviews would be hearsay. The judge deferred ruling on the limine request. He directed that "counsel should not at this time in their opening statements since I may forget to do anything further on it in the morning, don't either during voir dire or during the opening statement refer to it."

■■ Sgt. Parks did not testify in the state's case-in-chief. After the state rested, defendant, prior to presenting evidence, elicited testimony from Sgt. Parks as an offer of proof.[2] Sgt. Parks stated that he had interviewed the two women; that Naomi Nance told him what she was wearing at the time of William Nance's death—"a two-piece pajama set, a pink pant and a stretch top." He said Etta Jane Harper told him she was wearing "a blue pair of pajama bottoms with teddy bears and a white T-shirt with a '55 Chevrolet on the back." Sgt. Parks was asked if it was a "Café '55 Chevy T-shirt." He answered, "Yes."

At the close of the offer of proof, the state renewed the hearsay objection that was included in its motion in limine. The defendant contended the statements to which the motion in limine was directed were declarations against penal interest. The trial court sustained the objection and denied the offer of proof.

■■ Preliminarily, this court notes that one might argue that the testimony Point I claims should have been admitted was never tendered; that because the testimony was not formally offered but presented only as an offer of proof in opposition to the motion in limine, no issue was preserved for appellate review. See n. 2, supra. In Elliott v. State, 215 S.W.3d 88 (Mo.banc 2007), the court said with respect to a ruling on a motion in limine: ·

"A ruling in limine is interlocutory only and is subject to change during the course of the trial." State v. Purlee, 839 S.W.2d 584, 592 (Mo.banc 1992). "[A]dditional information produced at trial may prompt the trial court to alter its pretrial ruling and admit the evidence. Therefore, an objection must be made at trial when the evidence is offered or the reference made, preferably outside the hearing of the jury, in order to preserve for appellate review the ruling made thereon." State v. Evans, 639 S.W.2d 820, 822 (Mo.1982) (internal citation omitted.)

Id. at 92.

State v. Chambers, 234 S.W.3d 501 (Mo. App.2007), notes that " '[a]n offer of proof

---

2. " '[T]he usual way of presenting oral testimony is to call the witness to the stand and ask him [or her] questions.' 1 McCormick on Evidence § 51 at p. 195 (4th ed.1992). The admissibility of tendered evidence is decided by the judge sustaining or overruling objections to the testimony. Id." State v. Hemby, 63 S.W.3d 265, 268 (Mo.App.2001). An offer of proof is required if the trial court rejects the proffered evidence. State v. L.R., 896 S.W.2d 505, 509 (Mo.App.1995). The proponent of the evidence, upon the objection to the evidence being sustained, may tender testimony as an offer of proof outside the presence of the jury in sufficient detail to permit the trial court to intelligently rule upon the evidence that is offered and thereby preserve the matter for appellate review. Id.

made before trial at a hearing on a motion in limine will not suffice.'" *Id.* at 511, quoting *State v. Marshall,* 131 S.W.3d 375, 377 (Mo.App.2004). *Chambers* explains, "Courts strictly apply these principles based on the notion that trial judges should be given an opportunity to reconsider their prior rulings against the backdrop of the evidence actually adduced, and in light of the circumstances that exist when the questioned evidence is actually proffered." 234 S.W.3d at 511–12.

The ruling on the state's motion in limine was deferred until the time defendant would tender the evidence to which it was directed. Defendant made its offer of proof without tendering Sgt. Parks as a witness in open court. However, the concern that propels the caveat that a ruling on a motion in limine is interlocutory and, as such, will not support appellate review because additional evidence that may be produced at trial could prompt a trial court to alter its pretrial ruling on a motion in limine and admit the evidence, is not present in this case. At the time defendant made his offer of proof, all the evidence on which the trial court would base its ruling was before that court. Under the circumstances of this case, the record is sufficient to permit Point I to be reviewed.

▌ The statements to which the offer of proof was directed were tendered as statements against penal interest.

Before *Chambers v. Mississippi,* [410 U.S. 284[, 93 S.Ct. 1038, 35 L.Ed.2d 297] (1973)], Missouri courts had consistently held that declarations against the penal interests of an unavailable witness were not admissible as an exception to the hearsay rule in criminal proceedings. *State v. Brown,* 404 S.W.2d 179, 185 (Mo.1966); *State v. Williams,* 309 Mo. 155, 274 S.W. 427, 430 (1925); *State v. Hack,* 118 Mo. 92, 23 S.W. 1089, 1091 (1893); *State v. Evans,* 55 Mo. 460, 461

(Mo.1874). [Footnote omitted.] That rule has not been modified except to the extent required by *Chambers. State v. Turner,* 623 S.W.2d 4, 9 (Mo.banc 1981), *cert. denied* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982).

*State v. Blankenship,* 830 S.W.2d 1, 6–7 (Mo.banc 1992).

A declaration against a penal interest is not admissible as an exception to the hearsay rule. *State v. Blankenship,* 830 S.W.2d 1, 6 (Mo.banc 1992), but may be admissible as a due process right of the defendant only if the declarant is shown to be unavailable as a witness, there are considerable assurances of the statement's reliability, and the statement, if true, would exonerate the defendant. *State v. Jennings,* 815 S.W.2d 434, 448 (Mo.App.1991).

*State v. Davidson,* 982 S.W.2d 238, 242 (Mo.banc 1998).

The rule regarding admissibility of statements against penal interests is summarized in *State v. Robinson,* 90 S.W.3d 547, 553 (Mo.App.2002):

[T]he general rule in Missouri is that extrajudicial statements against penal interest are not admissible as an exception to the hearsay rule. Where due process requires, however, such statements will be admitted if (1) the declarant is unavailable as a witness; (2) the statements, if true, would exonerate the defendant; and (3) the statements carry substantial indicia of reliability. The United States Supreme Court in *Chambers* recognized three such indicia of reliability, as have Missouri courts, namely, (1) the statement must be self-incriminatory and undeniably against self-interest; (2) the statement must be made spontaneously to a close acquaintance shortly after the crime; and (3)

the statement must be corroborated by other admissible evidence.

*Id.* at 553.

The trial judge concluded that, if called as witnesses, the women whose out-of-court statements were the subject of the inquiry would decline to testify on the basis of the Fifth Amendment; that they were, therefore, unavailable to testify. He further found, however, that the statements regarding what clothing they were wearing would not necessarily be self-incriminatory and that the statements were not made to a family member or close acquaintance. The statements were made to a law enforcement officer, Missouri State Highway Patrol Sgt. Miles Parks. The judge also concluded that the statements would not exonerate the defendant from guilt in the crime. This court finds no abuse of discretion by the trial court in sustaining the state's objection and denying the offer of proof.

■ Defendant's participation in the crime went beyond what occurred at the time the victim lost his life. Defendant's acts included removing Nance's body from where the killing occurred. After wrecking the car in which he had placed Nance's body, defendant secured another vehicle and retrieved the body from the vehicle he had wrecked. He covered the body with a blue tarp to prevent it from being seen, transported the body to a location far from where the killing occurred, and dumped it in a wooded area near the Mississippi River. Even if shown that defendant did not personally commit the act of killing Nance, his actions apart from the actual killing would subject him to a determination of guilt for the offenses charged. "Accomplices are criminally liable if they affirmatively participate in the crime. Affirmative participation may be proved by circumstantial evidence, including presence at the scene of the crime, flight therefrom, and association with others involved before, during and after the commission of the crime." *State v. Friend,* 936 S.W.2d 824, 827 (Mo.App. 1996) (citations omitted).

■ Further, the statements defendant sought to admit as declarations against penal interest lacked sufficient indicia of reliability to permit their admission. There was no showing that the statements were made spontaneously to a close acquaintance shortly after the crime. Both statements were made to a law enforcement officer in interviews conducted after the declarants appeared at the sheriff's office and suggested that Nance may have been killed. Statements made to law enforcement officers not otherwise close acquaintances or relatives of a declarant do not satisfy the reliability test. *State v. DeClue,* 128 S.W.3d 864, 869 (Mo.App. 2004). Point I is denied.

■ Point II is directed to the trial court sustaining an objection to questions defendant's trial counsel asked Barry County Deputy Sheriff Brian Martin regarding whether the victim's widow, Naomi Nance, attempted suicide within four days following the victim's death. Defendant called Deputy Sheriff Martin as a witness. Deputy Sheriff Martin was asked if he had participated in the investigation of the death of William Nance. He answered that he had caused certain cell phone records to be subpoenaed. After identifying copies of cell phone records he had obtained, the records were admitted in evidence. Their contents were reviewed by means of questions asked Deputy Sheriff Martin and the answers Deputy Sheriff Martin gave to those questions.

Defense counsel asked, "And so far as working this case, did you become aware that Naomi Nance tried to commit suicide on the 8th of July?" The state objected on

the basis of relevance. The objection was sustained. Defense counsel approached the bench to explain his theory of why the question was relevant. Thereupon, the prosecutor further objected that there was insufficient foundation to permit the question; that it called for a hearsay response. The court again sustained the objection.

Defense counsel then asked Deputy Martin, "Officer, on July 8th of 2005, did you have occasion to see Naomi Nance?" Deputy Martin answered that he did not "specifically recall." Defense counsel produced a writing for the witness to review, after which Deputy Martin answered, "No, sir, I didn't see her that day."

Defendant contends that the trial court erred in sustaining the state's objection to the question concerting the officer's awareness that Naomi Nance attempted to commit suicide "in that this evidence supported the defense theory that Naomi and Etta killed Mr. Nance because Naomi's attempted suicide was evidence that the jury could have viewed as an admission and declaration against interest as to her involvement in her husband's killing and her attempted suicide was intended to avoid legal responsibility for her involvement or as an act conveying her remorse for killing her husband."

 Defendant's argument fails in that this court has no record before it from which it could ascertain if error occurred. There was no offer of proof. The record does not disclose what evidence would have been adduced had the trial court permitted the witness to answer the question.

An offer of proof is required to preserve a matter for appellate review. *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App. 1999). "When an objection to proffered evidence is sustained, the party offering the evidence must demonstrate its relevancy and materiality by way of an offer

of proof in order to preserve the matter for appellate review." *State v. Cardona–Rivera,* 975 S.W.2d 200, 204 (Mo. App.1998). Offers of proof "insure that the trial court and opposing counsel understand what evidence is being offered and its relevance to the case." *State v. Townsend,* 737 S.W.2d 191, 192 (Mo. banc 1987). "An offer of proof is required to allow the trial court to consider the testimony in context and to make an informed ruling as to its admissibility." *Dodd,* 10 S.W.3d at 556. [Footnote omitted.]

*State v. Comte,* 141 S.W.3d 89, 93 (Mo.App. 2004).

Here, as in *Comte,* it was defendant's responsibility to establish the admissibility of the rejected evidence and the trial court's error in its exclusion. "To the extent the rulings of which [defendant] now complains were not followed by an offer of proof, we are presented nothing for review." *Id.* Point II is denied. The judgment is affirmed.

BATES and SCOTT, JJ., concur.